## Niccolls's Estate. No. 1.

*E. C. Higbee,* of *Higbee, Lewellyn & Higbee,* for petitioner.
*Thomas J. Prather,* of *Humes & Prather,* contra.

DAWSON, P. J., Nov. 28, 1930.—John A. Niccolls died testate Oct. 16, 1892, and by his will appointed Josiah V. Thompson and William M. Thompson trustees of a fund later found to be $131,000. Of this amount $5000 was loaned by the trustees to William M. Thompson and $126,000 to Josiah V. Thompson on their respective individual promissory notes. Interest has not been paid on these loans since Nov. 4, 1914.

On May 4, 1927, a decree was made in the audit of their account, at which time they were surcharged for the amount then found due the estate, removed as trustees and directed to deliver within twenty days thereafter the property, books, accounts, papers and moneys belonging or relating to the trust to a trustee to be appointed.

On Jan. 16, 1928, the court appointed L. K. Porter, Esq., trustee, who duly qualified and demanded of the removed trustees compliance with the order of

court, and upon their failing so to do, on March 29, 1928, the new trustee presented his petition to court, setting forth such non-compliance, and obtained a rule for the attachment of Josiah V. Thompson, said defaulting trustee.

After hearing upon this rule, the court, on July 12, 1928, made the following decree:

"Second. The rule as to Josiah V. Thompson is made absolute, and an attachment is awarded directing that his body be taken into custody and committed to prison, there to remain until he pays to L. K. Porter, trustee under the will of John A. Niccolls, deceased, the sum of $126,000 principal and net income of $89,477, and the costs of this proceeding, or until he is discharged from confinement according to law. In order that defendant may have an opportunity to perfect an appeal, if he desires, attachment is decreed to issue Sept. 1, 1928."

Attachment issued Nov. 14, 1928, but was not served upon him until Nov. 26, 1929, owing to his absence and unknown whereabouts. When service was obtained it followed Mr. Thompson's arrest on a train at Altoona, Pennsylvania, on information charging him with embezzlement of said trust funds. From the time of his arrest until his trial he was under $25,000 bond. The embezzlement case came to trial in September last and resulted in an acquittal.

On Nov. 26, 1929, Mr. Thompson appeared in court with his counsel and the estate by its counsel. On his behalf, counsel explained that when arrested he was *en route* to New York City to keep a prearranged meeting with some prospective coal purchasers, he having in his possession at that time a large number of options on coal lands in Greene County. At the time of his arrest sworn statements had been made by him in the pleadings in the contempt proceedings that he was wholly without means to repay the trust funds. The court having this fact in mind; together with the seeming substantial character of the prospect of sale, concluded that the practical and common-sense thing to do under the circumstances was to give him a chance to make good, wholly or partially, if he could. The court was assuming that, above everything else, restitution was desired and not punitive measures, and to that end we have labored.

Other extensions followed for a similar or other good reasons, as we concluded.

On July 31, 1930, after much argument, the court made the second order of commitment. Immediately following this order his counsel presented a petition under the Act of June 1, 1915, P. L. 704, praying for the relief afforded thereunder, to the end that he be discharged from contempt. This petition recites that he owns twenty shares of common stock in a publications company, costing $1000 but of unknown present value; fifteen shares of stock of the Emerald Coal & Coke Company, par value $1500; six acres of coal lands, in Marshall County, West Virginia, costing $300 but of no market value; about sixteen acres of surface land in Washington County, Pennsylvania; ten lots in Muscle Shoals, on which has been paid $4250, leaving an unpaid balance, appearing in his schedule of indebtedness; library, $100, and cash, $1.49. It recites that he owes on notes, etc., $145,577.97.

Pending the hearing set for Sept. 22, 1930, on this petition and the rule granted thereunder, Mr. Thompson was released under bond of $25,000. To this petition answer was made on the day set for the hearing by L. K. Porter, trustee, averring that said act of assembly has no application to a decree of surcharge and commitments for contempt. At the same time a second petition was presented on behalf of the respondent in accordance with the provi-

sions of subdivision 8 of division *(b)* of section 18 of the Orphans' Court Act, praying that he be decreed to have purged himself of said contempt.

At this hearing it was concluded to take the testimony of witnesses, subject to the ruling of the court as to which act, if either, might be invoked, as the record stands.

The essential portions of the Act of 1915 for our consideration under which the first petition was drawn are as follows:

"Section 1. Be it enacted, etc., that from and after the passage of this act, any person arrested or held in custody, on or by virtue of any process issued on a judgment obtained in any civil action in this Commonwealth, may present his petition to the court, or any law judge thereof, out of which the process or execution issues, praying for his discharge from arrest. The petition shall set forth the nature of the proceedings out of which the process, upon which the petitioner is held, issued, the amount of the judgment therein obtained, a schedule of all the assets of the petitioner, a list of the creditors of the petitioner with the amounts of their claims; the addresses of the creditors, and the nature of the debts owing to them; a statement as to why the petitioner is unable to pay the judgment, and shall be verified by the affidavit of the petitioner."

"Section 4. Upon the hearing of the rule the petitioner shall be required to answer all questions put to him, and shall produce all books and papers required of him; and if it shall appear to the court that the petitioner is without means or property with which to pay the judgment, and that he has not secreted or assigned any of his property so as to avoid the payment of the judgment, the court may discharge him from arrest in said proceedings; but such discharge shall not in any way affect the judgment entered against him. Any person arrested or held in custody on or by virtue of, any process issued on a judgment obtained in any civil action in this Commonwealth shall be discharged at the expiration of sixty days from the date of the commitment, if compliance is had with all the requirements of this act and all other acts of Assembly relating to insolvency.

"Section 5. All acts or parts of acts inconsistent herewith be and the same are hereby repealed."

The language used in the first section of the act is comprehensive, for it says that "any person arrested . . . by virtue of any process issued on a judgment in any civil action . . . may present his petition to the court . . . out of which the process issues, praying for his discharge from arrest."

The provisions in the Insolvent Debtors' Acts of 1836 and 1842 provide for the presentation of the petition of one arrested, not to any court, as in the Act of 1915, but expressly to the court of common pleas. This act expressly repeals all former acts inconsistent therewith.

As to repugnant acts passed at different sessions of the legislature, Endlich, Interpretation of Statutes, section 187, states: "The same rule, which, between two irreconcilable passages or provisions in the same statute, gives validity to the later one, requires that, where two statutes are irreconcilable and mutually repugnant, the one later in date or order should be held to repeal the earlier one."

Even where there has been no express repeal of a former statute in such case (Johnston's Estate, 33 Pa. 511, 515), our Supreme Court said: "It has been said that, a subsequent statute, revising the whole subject-matter of a former one, and evidently intended as a substitute for it, although it contains no express words to that effect, must, on the principles of law, as well as in reason and common sense, operate to repeal the former." See, also, Hammond

*v.* Aluminum Co. of America, 261 Pa. 370, ·377; Jefferson County *v.* Rose Township, 283 Pa. 126, 131.

These authorities would seem to support the position that the Act of 1915 might be applicable, inclusive of the orphans' court.

To revert again to an analysis of this act, the next question arises whether "any person arrested or held in custody, on or by virtue of any process issued on a judgment obtained in any civil action," can legally present his petition to the orphans' court for discharge from contempt when such arrest or detention arose from a decree of the orphans' court to pay money by a trustee to his successor in the trust.

The status of the orphans' court was early fixed by the Act of March 29, 1832, P. L. 190, which, *inter alia,* recites: "The Orphans' court is hereby declared to be a Court of Record, with all the qualities and incidents of a Court of Record at common law; its proceedings and decrees, in all matters within its jurisdiction, shall not be reversed or avoided collaterally in any other court, but they shall be liable to reversal, modification or alteration on appeal to the Supreme court."

What is the meaning of the word "judgment?" Is the decree of an orphans' court to pay embraced in the word "judgment" as used in this act?

Webster defines the word "judgment" as meaning *(a)* the act of determining, as in courts, what is conformable to law and justice; also the determination, decision, decree or sentence of a court; *(b)* the obligation, especially a debt, created by the decision or decree of a court; also, the official certificate evidencing such a decision or decree.

We refer to the following legal definitions of the word:

"In its broadest sense a judgment is the decision or sentence of the law given by a court of justice or other competent tribunal as a result of proceedings instituted therein. In the broad sense here defined, a decision of any court is a judgment, including courts of equity, admiralty and probate:" 33 Corpus Juris, 1047.

"A judgment is the determination of the law as the result of proceedings instituted in a court of justice:" Mahoning County Bank's Appeal, 32 Pa. 158, 160.

"The decision or sentence of the law, given by the court of justice or other competent tribunal, as the result of proceedings instituted therein for redress of an injury:" 3 Blackstone, 395.

Said Freeman on Judgments (vol. 1, § 20) : "Orders of a probate court commanding the administrator to pay over money or to sell property to pay debts are judgments."

It is evident from these varied authorities that an order to pay by the orphans' court is comprehended in the designation "judgment." But according to the act it must be a judgment obtained in a "civil action."

Mr. Justice Brewer, in the case of State of Iowa *v.* Chicago B. & Q. R. R. Co., 37 Fed. 497, quotes from various authorities the definition of a "civil action." One of them is as follows: "A civil action is an action brought to recover some civil right, or to obtain redress from some wrong not being a crime or misdemeanor." It follows then that all judgments obtained in the orphans' court are necessarily civil judgments arising out of civil actions because of the exclusion of criminal jurisdiction. Even contempt proceedings are held to be civil actions: Patterson *v.* Wyoming District Council, 31 Pa. Superior Ct. 112, 117, and McCullough, Jr., *v.* Large et al., 20 Fed. 309.

However, only three cases, so far as we can find or in so far as has been cited .by counsel, have reached the appellate courts involving this act. None

of these, nor the only two lower court cases reported, raise the question of discharge of fiduciaries.

For the moment, we will turn to the Orphans' Court Act, section 18 *(b)*, 8, under which the second petition was drawn. It provides as follows: "Any person attached as for contempt in refusing to obey an order or decree of the orphans' court, whether for the payment of money or in any other case, may be discharged from custody by said court on his complying with the order or decree of the court, or paying the money for which such order or decree has been made, or upon his purging himself of contempt to the satisfaction of the court by whose order he was attached."

The report of the commissioners appointed to codify and revise the law of decedents' estates adds to this section the following note: "This is a new clause, introduced to make it plain that such discharge may be made by the orphans' court, and that the respondent need not resort to insolvency proceedings in the court of common pleas. There is a conflict of authority on the question under the existing law. See Baker's Estate, 21 Dist. R. 177; Ex parte Batdorff, 13 W. N. C. 417."

The Baker case arose in the Orphans' Court of Philadelphia on petition for attachment, and was decided in 1909. The view of the court as to its control of the writ is expressed in the syllabus as follows: "The control of the process of attachment to enforce decrees of the orphans' court for the payment of money is entirely within the power of the court, and delinquents in proper cases may be discharged, although they have not obeyed, and could not obey, the order of the court."

The state of the law as the court then understood it was illustrated by three cases cited. In the first case, Bolton's Estate, 13 Phila. 340 (1880), the petition was drawn under the Act of March 29, 1832, P. L. 190, 208. It held that it was within the discretion of the orphans' court to permit a party, attached and committed for contempt for not obeying an order of the court, to purge himself from such contempt.

The second case, Stevenson's Estate, 7 W. N. C. 65, is one where the court held that the respondent, showing his actual inability to comply with the order of court, not arising from his own peculation and fraud, should be discharged.

And the third case, Irwin's Estate, 9 Dist. R. 282, held that the contempt is purged where it is shown that the failure to comply with the order is due to inability which has not been brought about by an act or default by the contemner.

The second case referred to by the commissioners is illustrative of the other line of cases holding that the orphans' court is without jurisdiction to discharge a person committed by reason of his inability to pay. The opinion in this case was rendered by Judge McPherson in 1883. Henry Batdorff, the petitioner therein, was the administrator of Percival Batdorff, and had been committed to prison under an attachment issued to compel him to pay the widow of his intestate a sum of money which was decreed to her Nov. 13, 1882. The court held it had no jurisdiction to discharge him from jail because of his inability to pay, which would mean imprisonment for life.

The above cases show clearly the "conflict of authority" alluded to by the commissioners.

But counsel for respondent argues vigorously that the orphans' court has jurisdiction under either act to consider the question of discharge. No appellate or lower court decision has been rendered to pass upon this question, so far as we can learn, to enlighten us. When we contemplate the reso-

lution of the legislature passed April 23, 1915, P. L. 177, as to its comprehensiveness in creating the commission, we observe it gave to it broad powers "to codify and revise the law of decedents' estates, whether testate or intestate, and to report the same to the next general assembly, and to recommend such changes in the existing law as may to such commission seem desirable." As a result of their labors, we have eight acts comprehending the entire range of orphans' court law, practice and procedure. One of these acts is known as the Orphans' Court Act. In the commission's preliminary notes to its report it speaks of giving "enlarged powers" to the orphans' court, "including attachment to enforce obedience to its orders." It is, therefore, a common sense view to conclude that this new clause was studiously added as the instrumentality to enforce obedience to the orders of the court. Accordingly, the motion to dismiss the petition presented under the Insolvent Act of 1915 is allowed and the rule discharged.

If the testimony taken has any application, it would, therefore, be under the second petition. The misuse of funds in the instant case is really more apparent than in the Messmore case, reported in 293 Pa. 63. There, Mr. Thompson took the position that his agreement with the Messmores to carry their coal lands had terminated, and, therefore, his executorship was at an end, and he, as an individual, was at liberty to deal with them for these lands as individuals. The court held this position untenable, and he was ordered to pay, to which order he answered his inability to pay because of poverty, and, therefore, could not be adjudged in contempt. The court held otherwise; hence the appeal, with an affirmance.

In this case, on page 69, the court said: "Although not charged with fraud arising malo animo, appellant is guilty of maladministration of trust funds, and this is a species of fraud; he is, therefore, not in the position of one who pleads inability to pay because of poverty which came upon him through no fault of his own. The law is not lenient to those in the position of appellant; we said in Com. ex rel. Di Giacomo v. Heston, 292 Pa. 63, 68, that 'a trustee who fails to pay over the funds entrusted to his care, is subject to attachment for contempt, as is an executor (Tome's Appeal, 50 Pa. 285) or guardian: Leiter's Appeal, 10 W. N. C. 225.' It is well stated in 13 Corpus Juris, 20, that 'when the inability [to pay] is due to the wrongful act of the party himself, the contempt is not excused, as where he has misapplied or misappropriated funds held by him as attorney, administrator, receiver, guardian, or in other trust capacity.' This principle is well settled; see Hoffman's Estate, 10 Pa. Superior Ct. 113, and cases there cited; also Morrison v. Blake (No. 1), 33 Pa. Superior Ct. 290, where it was held that a person attached for contempt for not paying over trust moneys could not purge himself by alleging poverty, the court saying, at page 295: 'The mere answer of a trustee that he has wrongfully wasted or otherwise stripped himself of the trust fund may not stay the arm of a chancellor when the day for accounting has arrived, else indeed would his decree be but an empty name, and breaches of trust would become common by reason of their immunity from any dangerous consequences.' "

It is to be noted there is a clear line of distinction made between those unable to pay where there is no misuse of the funds and in cases where it is otherwise. Furthermore, it would indicate that it is a serious question whether or not, he having been adjudicated in contempt, a state of circumstances could arise whereby a court would be justified in granting relief from imprisonment short of payment. But, aside from this, a consideration of the

testimony of the respondent will clearly indicate the duty of the court in the premises.

Counsel for respondent examined his witnesses so as to support both of his petitions, and in the production of testimony nearly all of it came from Mr. Thompson, which was not controverted, so all are bound thereby. By his discharge in bankruptcy he was legally freed from his creditors. He testified that by the proceedings in bankruptcy he surrendered all of his properties of every kind, including 300,000 acres of coal lands, and when the trustees sold his properties he had no secret understandings or agreements with the purchasers as to any future participations in these properties.

At the conclusion of the war Mr. Thompson began optioning and selling coal lands. In some detail he enumerated coal sales made and commissions earned, amounting to $220,000 to $250,000, covering the period from 1920 to 1923. Subsequent to this he had not made any sales nor made any money, but in another place he testified that about 1927 he made at least $1400. These earnings had been kept in various banks, principally the Mellon Bank of Pittsburgh. With these latter deposits were included moneys to his credit for taking up some of the coal lands from the purchasers, and, further, this, the most important of his bank books, could not be found anywhere after diligent search. No books of record had been kept of receipts or disbursements, and only a partial list of checks drawn on these deposits could be produced.

It might be added that the respondent, or his counsel, had been notified previous to the hearing to produce all books, papers, checks, etc.

Mr. Thompson's failure disclosed that he owed many millions of dollars to several thousand creditors. Through the bankrupt estate they have received 12 per cent. of their claims. Many creditors thus lost practically all they had and were reduced to want. Particularly has this been so with some of the aged and widows. From memory he recalled the names of fifty-four creditors, all of whom were women but eight, to whom he paid $79,000 as partial payments on their notes, some by check and some by cash. Notes were offered in evidence, paid in full by him, which, with the interest, in round numbers amounted to $100,000. In his testimony he maintained he had made payments to about 200 creditors in all out of the commissions. No doubt, many of these creditors, especially the helpless women, were importunate in their appeals for money, as he testified, and many of the payments meant the supplying of much needed necessities to sustain life.

To show large income from other sources by the life tenant and that the respondent aided in its procurement; to show that the remaindermen have support from other sources; to show that the respondent, as executor, converted the Niccolls's estate from coal acreage subject to a $100,000 debt, into a net balance of $312,000 for widow, daughter and grandchildren, will not avail under the law, but should have been strong mitigating circumstances to the extent, at least, of that worthily bestowed upon the truly needy, for, after the discharge, such payments were only moral and not legal obligations. Here the obligation is both moral and legal.

In this selection of creditors the reason is apparent, but not so when Dr. Anjou received from him $50,000 to $60,000 for a family genealogy. As late as 1927, $1400 was paid upon this account. In this expenditure even the needy creditors were forgotten. To spend this amount of money for such a purpose by a man of abundant means and no creditors would invite unfavorable comment by his business associates, but when such an improvident expenditure is made with the obligation hanging over him to make restitution to a trust, the duty of the court is so plain that no elaboration is necessary.

To have come into court with a previous tender of this amount of money, or its apportionment to this and the companionate Messmore claim, would appeal more to the conscience and discretion of a court rather than to say in effect that the preservation of family history is paramount to restitution of trust funds. To this no court could subscribe.

We have sympathy for Mr. Thompson in his unhappy plight, just verging on his seventy-seventh year, and now sitting in the shadows of the sunset of his life, with vision badly impaired and cherished hopes crushed, yet with a mind keen and alert, and a seeming desire for his liberty to atone for his mistakes, now realized, by being permitted to continue his efforts to earn money in the sale of coal acreage and thus make restitution. It was this compassion and, above all, his well-recognized abilities for salesmanship and willingness to work that induced us to make the extension we did, in the hope that restitution might be the more assured, the community at large benefited by sharing in the sale of coal lands and himself saved humiliation. Save Mr. Thompson himself, none perhaps feels more keenly the disappointment in his inability to make the hoped-for sales nor the dread of an order to commit.

*Order.*

And now, Nov. 28, 1930, the petition filed July 31, 1930, under the Act of June 1, 1915, P. L. 704, and that filed Sept. 22, 1930, under the provisions of subdivision 8 of division *(b)* of section 18 of the Orphans' Court Act of June 7, 1917, P. L. 363, are dismissed and the rule under the first petition discharged, and that petitioner surrender himself into the custody of the Sheriff of Fayette County on or before Dec. 9, 1930, unless exceptions be filed on or before that date, and Tuesday, Dec. 9, 1930, at 10 o'clock A. M., is fixed as the time for argument of such exceptions as may be filed.