## Gordon, Secretary of Banking, v. Winneberger.

*Harold D. Saylor*, for plaintiff.
*Harry L. Jenkins, James F. Boylan, Stanley Folz* and *Geo. Wharton Pepper*, for defendant.

STERN, P. J., May 20, 1932.—The Susquehanna Title and Trust Company was incorporated on April 30, 1924, as a title insurance company under section 2, paragraph 19, of the General Corporation Act of April 29, 1874, P. L. 73, its capital stock being $150,000 divided into 3000 shares of a par value of $50 each. The defendant is, and ever since the incorporation of the company has been, a stockholder to the extent of sixty-five shares of its capital stock. The company has at all times since its incorporation exercised the powers given to it by the Act of May 9, 1889, P. L. 159, the Act of June 1, 1907, P. L. 382, and the Act of May 9, 1923, P. L. 173.

On January 6, 1930, the secretary of banking, under and by virtue of the Act of June 15, 1923, P. L. 809, took possession of the business and property of the company for the reason that an examination showed it to be in an unsafe and unsound condition to continue business, and that it had suspended payment of obligations.

On March 25, 1931, the secretary of banking filed his first and partial account of the administration of the estate of the company, showing assets appraised at $260,866.17 and approved depositors' claims of $523,345.35. After paying a 25 per cent. dividend to the depositors on July 6, 1931, there are now on hand assets appraised at $123,845.92, and the secretary of banking has

determined that the reasonable value of the company's assets is not sufficient to pay its creditors in full by an amount in excess of double the par value of the entire stock held by the stockholders of the company. He, therefore, has deemed it necessary to enforce the alleged individual liability of the stockholders of the company to the extent of 100 per cent. of the par value of their respective holdings of stock, and accordingly, on November 18, 1931, pursuing the procedure outlined in section 37 of the Act of June 15, 1923, P. L. 809, made demand in writing upon the stockholders for the payment of their pro rata assessments. The present defendant was assessed in the amount of the par value of his holdings of stock, namely, $3250, and as he failed and refused to pay the assessment, the secretary of banking brought the present suit against him to recover from him that amount, with interest from December 19, 1931, which was the date fixed by the secretary of banking as the time when the payment was required.

The defendant filed an affidavit of defense raising questions of law, claiming that no valid cause of action is alleged in the statement of claim; that no valid act of assembly imposes upon the defendant any liability as a stockholder of the company in excess of the par value of his stock holdings; and that the secretary of banking has no authority to assess him as a stockholder for any sum in addition to the par value of his holdings of stock in the company.

The question thus presented to the court for determination is whether the stockholders of a title insurance company, incorporated under the General Corporation Act, but invested with and exercising in addition the powers granted by subsequent legislation, and which has become insolvent and is in the possession of the secretary of banking, are individually liable in any amount to depositors and other creditors of the company.

Prior to the Constitution of 1874, trust companies, saving fund institutions, banks and banking companies were incorporated in great numbers under special charters which conferred upon them various powers. Generally speaking, the banks were given the right to receive money on deposit, to discount paper and to issue bank notes, while the trust companies were given the right to receive money on deposit and to exercise fiduciary functions of various kinds. In the case of some of these specially chartered institutions there was no provision for individual liability of stockholders over and beyond their unpaid subscriptions to the capital stock.[1] In the case of others, however, there were provisions that the stockholders should be liable for all debts of the company in an amount equal and in addition to the amount of capital stock held by them,[2] while still others provided that the stockholders should be individually liable to the extent of double the amount of capital stock held by them, thus imposing a liability which, together with the original subscription to the capital stock, constituted in effect a treble liability.[3] Some charters went so far as to provide that the stockholders should be individually liable for all debts due to the depositors of the institution; that is to say, they were made just as liable, as far as deposits were concerned, as if the association had not been incorporated at all.[4]

In addition to the special charters there were passed from time to time more or less general acts referring to the regulation and incorporation of banks, as, for example, the Act of March 21, 1814, 6 Sm. Laws 154, the Act of April 16, 1850, P. L. 477, and the Act of March 31, 1860, P. L. 459. Of these acts, that of April 16, 1850, provided that the stockholders should be individually liable to noteholders of the bank to the amount of all notes issued.

Prior to the Constitution of 1874, there was no general incorporation act for title insurance or trust companies of any kind.

The General Corporation Act of the state became a law on April 29, 1874, P. L. 73. It provided for the incorporation of companies for certain purposes enumerated, and, among others (section 2, paragraph 19), for "the insurance of owners of real estate, mortgagees, and others interested in real estate, from loss by reason of defective titles, liens and encumbrances."

Section 24 of the act provided that "the officers and stockholders of corporations organized under or accepting the provisions of this act shall not be individually liable for the debts of said corporation otherwise than in this (sic) provided."

The only provision in the act for such individual liability was in section 14, in the case of debts for work or labor done, or materials furnished, to carry on the operations of the corporation.

The General Corporation Act did not cover the incorporation of banks, and, therefore, the provision against individual liability which it contained did not change the then existing law in any respect except as to liability for work or labor done or materials furnished.[5]

Within twelve days after the General Corporation Act there was passed the Act of May 11, 1874, P. L. 135, which gives rise to the problems involved in the present case. That act was entitled: "An act fixing the liability of stockholders of banks and banking companies and other banking institutions in this Commonwealth;" and provided that "all stockholders in banks, banking companies, saving fund institutions, trust companies, and all other incorporated companies doing the business of banks or loaning and discounting moneys as such in this Commonwealth shall be personally liable for all debts and deposits in their individual capacity to double the amount of the capital stock held and owned by each."

It further provided that in the case of banks then already chartered this liability should accrue only if the stockholders, by certain specified proceedings, declared their intention to accept the provisions of the act.

It is to be noted at the outset that the individual liability imposed by this statute was a treble one in the sense that stockholders, having paid the amount of their subscription to the capital stock of the corporation, were made personally liable to double the amount of the capital stock held by them, if such additional amount should be required to pay the debts and deposits. The language of the act follows that of many of the special charters prior to the Constitution of 1874, one of which was construed by the Supreme Court in Dreisbach v. Price, 133 Pa. 560 (1890). That case dealt with the liability of stockholders of the Miners' Savings Bank of Summit Hill, incorporated by Act of April 10, 1873, P. L. 674. The charter provided that the stockholders should be individually responsible for all debts of the bank "to the extent of double the amount of the stock subscribed for or held by them," and it was decided that under this clause the stockholders were individually liable to creditors to the extent of double the par value of their stock in addition to their liability to the corporation for any stock subscribed and not paid for.

It is obvious that there was no inconsistency between the Act of April 29, 1874, and that of May 11, 1874—at least as far as then appeared. The latter provided for an added individual liability of stockholders of banks; the former provided for no such liability, but applied only to corporations other than banks.

Two years after the adoption of the Constitution of 1874 a new General Banking Act was passed, supplanting that of March 31, 1860. This was the Act of May 13, 1876, P. L. 161, and it is still the act under which banks are incorporated in Pennsylvania. It gave to associations incorporated under it

the power to borrow or lend money, discount negotiable paper and hold real or personal property in trust or as collateral security for loans or discounts. It provided (section 5) that the shareholders of any corporation formed under it should be individually responsible for all debts of the corporation "to the amount of their stock therein at the par value thereof in addition to the par value of such shares," which, it will be observed, prescribes a double liability as distinguished from the treble liability imposed by the Act of May 11, 1874. Section 33 of the act expressly repealed all general acts or parts of acts inconsistent with it.

The situation after 1876, therefore, was that the only way to incorporate a company for other than banking purposes was under the General Corporation Act of 1874, and in the case of such a corporation there was to be no individual liability of stockholders; the only way to incorporate a bank was under the new General Banking Act of May 13, 1876 (which repealed previous banking incorporation acts), and in the case of such banks there was to be double liability of stockholders. The varying individual liabilities provided by the special charters previous to the Constitution of 1874 still continued.

A few years later there was started a series of acts giving additional powers to title insurance companies incorporated under the provisions of the General Corporation Act of 1874. The first of these was the Act of May 24, 1881, P. L. 22, which empowered title insurance companies having a capital stock of not less than $250,000 to receive real and personal property on deposit, and in trust, and as security; to insure the fidelity of trustees; to receive property on deposit for safe keeping; to act as assignees, receivers, guardians, executors, administrators and trustees; to act as agent for issuing of stocks and bonds; to become surety for the faithful performance of any trust or office, etc. But there was an express provision against such companies engaging in the business of banking.

Next came the Act of May 9, 1889, P. L. 159, which extended the powers given by the preceding act to title insurance companies having a paid-up capital of not less than $125,000, and, in addition, conferred upon such companies the right to take charge of real estate, to act as security for the performance of contracts and for the faithful performance of the duties of public officers and private employees, and to become security in court proceedings, etc. Again there was an express provision that such companies should not be allowed to engage in the business of banking.

The next act was that of May 29, 1895, P. L. 127, which assured to title insurance companies the right to receive deposits of money and other personal property and issue their obligations therefor, to invest their funds in real and personal securities and to loan money thereon.

Then followed the Act of June 1, 1907, P. L. 382, which conferred upon title insurance companies having a paid-in capital of at least $125,000 the power to guarantee the payment of the principal and interest of bonds secured by mortgages on real estate, and to execute policies effecting such guaranties.

Thus it will be seen that the legislature gradually gave to title insurance companies incorporated under the General Corporation Act of 1874 powers usually exercised by banking institutions, and in this way practically enabled such institutions to come into existence under the General Corporation Act (as title insurance companies) instead of under the General Banking Act of May 13, 1876. Naturally there arose the question as to whether title insurance companies had not in effect become banks, and that problem presented itself to the courts for determination in 1909 in two cases, namely, Prudential Trust Company's Assignment, 223 Pa. 409, and De Haven v. Pratt, 223 Pa.

633. Certain acts of assembly gave to depositors of banks a preference over other creditors, and in the case of Prudential Trust Company's Assignment it was contended that the same rule should apply to an insolvent trust company which had been chartered as a title insurance company under the General Corporation Act, although there was no act which conferred a preference upon depositors in the case of associations incorporated under that act.[6] The Supreme Court held that the preferential provisions governing banks did not apply to the case of the trust company, in that "trust companies created under the provisions of the General Corporation Act of April 29, 1874, P. L. 73, and deriving their privileges and powers from the Act of 1889 and other supplementary statutes, are neither banks of issue nor of discount and deposit within the meaning of the law, and, therefore, the acts relied on as giving a preference to bank depositors are not authority for the proposition that the same preference must be given to depositors in a title and trust company incorporated for a different purpose and being denied by the express language of the statute the right to engage in the business of banking."

In the De Haven v. Pratt case the direct question was raised as to whether the stockholders of an insolvent title insurance company organized under the General Corporation Act of 1874 were subject to the additional liability prescribed by the Act of May 11, 1874. In that case the receiver of such a company filed a bill in equity to enforce against the stockholders such liability.[7] The Supreme Court held, in the first place, that the words "trust companies" used in the Act of May 11, 1874, applied only to trust companies specially chartered prior to the adoption of the Constitution of 1874, and not to the trust companies which grew out of the title insurance companies incorporated under the General Corporation Act. The court held, in the second place, that none of the statutes, above enumerated, granting additional powers to title insurance companies, brought the latter within the category of banks or banking companies or other companies doing the business of banks, as specified in the Act of May 11, 1874, the court pointing out that the principal grants of powers thus made were contained in statutes which expressly denied the right of such title insurance companies to engage in the business of banking.

It was thus judicially established that, so far as any legislation prior to 1909 was concerned, title insurance companies had not made themselves subject to legislation which by its terms applied to banks or to companies doing the business of banks. It is interesting to observe, however, that in the opinion of Judge Sulzberger in the court below, which was affirmed in the appellate court, he apparently arrived at the conclusion that the distinguishing characteristic of a bank was the discounting of notes. It also is to be observed that the contention of counsel for the appellee that the Union Surety and Guaranty Company (which was the company involved in the case) was not doing the business of a bank, was based upon the fact that it did not have the privilege of discounting commercial paper.

In the De Haven v. Pratt case Justice Elkin referred to article 16, section 11, of the Constitution of 1874, which provided that "no corporate body to possess banking and discounting privileges" should be created in pursuance of any law without three months' previous public notice, nor should a charter for such privilege be granted for a longer period than twenty years. Justice Elkin pointed out, therefore, that no banking privileges could constitutionally be given to an association incorporated under the General Corporation Act. This section of the Constitution, however, was amended November 2, 1920, so as to strike out the limitations therein contained, and there was thus

paved the way for the Act of May 9, 1923, P. L. 173, which gave to "every trust company and bank organized and incorporated under the laws of the Commonwealth of Pennsylvania" the power to "discount, buy, sell, negotiate and assign promissory notes, drafts, bills of exchange, trade and bank acceptances, bonds and other evidences of debt, and to receive and retain in advance interest on loans and discounts made."

It is, therefore, now claimed by the secretary of banking, the plaintiff in the present case, that the very power which is the most distinguishing characteristic of banks, namely, that of discounting negotiable paper, having been given to title insurance companies incorporated under the General Corporation Act, and the circumstance or factor which was missing in the De Haven *v.* Pratt case thus having been supplied, such companies have now been brought within the language of the Act of May 11, 1874, in that, if not "banks" or "banking companies," they are at least "incorporated companies doing the business of banks or loaning and discounting moneys as such in this Commonwealth."

The only case which has arisen since the passage of the Act of May 9, 1923, which bears in any way upon the present question is that of Media Title and Trust Co. *v.* Cameron, 289 Pa. 96 (1927). The title company in that case sought to establish its right to maintain a branch office other than in the town where its principal office was located. It was incorporated, of course, under the General Corporation Act, and that act, at least impliedly, allowed companies chartered under it to have more than one place of business. On the other hand, the Act of July 28, 1917, P. L. 1235, gave permission to banks of discount and deposit incorporated under the Act of May 13, 1876, to maintain branches only in the town where their principal place of business was located. The secretary of banking contended that the title company had become a bank within the meaning of this Act of July 28, 1917, and based such contention upon the legislation giving the additional powers to title companies hereinbefore enumerated and including the Act of May 9, 1923. The Supreme Court held, however, contrary to this argument, that the title company was not subject to the Act of July 28, 1917. The case, however, is not really an authority on the point here involved, in that the Act of July 28, 1917, was expressly limited by its terms, as above pointed out, to banks incorporated under the General Banking Act of May 13, 1876, and since the Media Title and Trust Company was not incorporated under that act but under the General Corporation Act of 1874, the Act of July 28, 1917, could not have applied to it in any event, and consequently the question now presented did not there arise.

We are, therefore, confronted for the first time with the problem as to whether or not title insurance companies incorporated under the General Corporation Act have, by virtue of the powers given to them by the Act of May 9, 1923, supplementing the series of enabling acts which preceded it, become "companies doing the business of banks or loaning and discounting moneys as such." In our opinion, they have become such companies.

A bank is "an association or corporation whose business it is to receive money on deposit, cash checks or drafts, discount commercial paper, make loans and issue promissory notes payable to bearer, called 'bank notes:'" 7 C. J. 473.

"The business of banking, as defined by law and custom, consists in the issue of notes payable on demand, intended to circulate as money when the banks are banks of issue; in receiving deposits payable on demand; in discounting commercial paper; making loans of money on collateral security; buying and selling bills of exchange; negotiating loans, and dealing in negotiable secur-

ities issued by the government, state and national, and municipal and other corporations:" Mercantile Bank *v.* New York, 121 U. S. 138.

It is not necessary, however, that a bank should exercise all of these functions. It may be a bank of deposit, which includes savings banks and all others receiving money on deposit; or it may be a bank of discount, which loans money on collateral or by means of discounts of commercial paper; or it may be a bank of circulation, which issues bank notes payable to bearer: 7 C. J. 474. Due to national legislation taxing the issues of state banks out of existence, such banks are now obliged to confine themselves to receiving deposits and discounting negotiable paper and to such additional powers as have been granted to them by legislation paralleling the powers given to trust companies.[8]

The court doubts whether the defendant can point out any power possessed by a bank of discount and deposit under the laws of Pennsylvania which is not possessed by title insurance companies incorporated under the General Corporation Act and enjoying the powers given to them by subsequent legislation. We are, therefore, of opinion that if the Act of May 9, 1923, had been in effect when the case of De Haven *v.* Pratt was decided in 1909, the court would there have arrived at a different conclusion. Indeed, as pointed out by Judge Sulzberger in that case, the very phraseology of the Act of May 11, 1874, indicates that the loaning and discounting of moneys was to be the decisive factor in determining whether a company was doing the business of a bank. As Judge Sulzberger said:

"The corporations intended to be reached, whether known as banks, banking companies, saving fund institutions, trust companies and all other incorporated companies, were to have one characteristic in order to be the companies that were meant by the act, and that characteristic was: 'Doing the business of banks or loaning and discounting money as such.' To our apprehension the word 'or' is here used to mark an equivalent and has the same effect as if it were 'that is,' and it means, in the very words of the Constitution, that the business of banks is loaning and discounting, not loaning or discounting, the bulk of the loans being contemplated to be by the ordinary commercial process of discount. Moreover, the words 'as such,' though not happily chosen, have a significance of their own; they mean 'as banks do.'"

As far, then, as the question whether or not the Susquehanna Title and Trust Company had become a company doing the business of banks within the meaning of the Act of May 11, 1874, is concerned, we would have no hesitation in arriving at an affirmative conclusion. The result would be that, if that act is still effective, there would arise the problem of the incompatibility between the Act of April 29, 1874, and the Act of May 11, 1874—a problem which did not exist at the time of the passage of those acts but arose by reason of the supplemental legislation hereinbefore referred to—in that we now have a corporation which was incorporated under the General Corporation Act which declared that the stockholders should be free from additional or individual liability, and yet because the corporation is now doing the business of banks and has thus brought itself under the terms of the Act of May 11, 1874, its stockholders are subjected by that act to treble liability. Were we obliged to solve this difficulty, our opinion would be that, since the May act is the later in date, and since it provides for individual liability of stockholders in the case of corporations taking on the kind of business to which it refers, apparently irrespective of the act under which they may happen to have been incorporated, its provisions would have to be construed as being paramount to those of the Act of April 29, 1874. That is to say, that while a title insurance company

may have started its corporate life under the Act of April 29, 1874, without individual liability of stockholders, it subjects them to such liability when it undertakes to assume the powers which would bring it within the operation of the Act of May 11, 1874. Neither do we think there is merit in defendant's contention that the title of the Act of May 11, 1874, is not sufficiently comprehensive to warrant this conclusion; the title covers stockholders not only of "banks" and "banking companies," but of "other banking institutions;" that phrase would seem broad enough to include any company doing a banking business, and, as previously stated, it is our opinion that a trust company exercising the powers granted to it by the Act of May 9, 1923, does a banking business. And, while we recognize the force of defendant's contention that statutes imposing additional liability of any kind are in derogation of the common law and, therefore, should be strictly construed, we do not think that this doctrine can be invoked in the present case because not only is the grant of powers in the Act of May 9, 1923, entirely clear, but, as we have attempted to point out, the nature of the institutions of which the stockholders are to be subject to additional liability is clearly expressed in the Act of May 11, 1874, and, therefore, there is no ambiguity in either act requiring the application of principles of construction which are properly invoked only in cases of ambiguous phraseology.

All of this discussion, however, is academic in view of the conclusion at which the court has arrived on a more basic feature of the situation. Since the passage of the Act of May 11, 1874, the only case dealing with it has been that of De Haven *v.* Pratt, hereinbefore referred to, which merely held that up to the time of that decision title insurance companies had not subjected themselves to the provisions of that act. There is no case, therefore, which holds that the act was in force as to any banking institutions incorporated since the passage of the General Banking Act of May 13, 1876, and, in our opinion, it was not and is not so in force. We are of the opinion that the General Banking Act of May 13, 1876, providing, as it did, for a double liability of stockholders of banks incorporated under it, worked a repeal of any further operation of the Act of May 11, 1874, which imposed a treble liability upon the stockholders. Prior to the Constitution of 1874, there would have been nothing to prevent a statute from providing for a double liability in the case of corporations incorporated under it, even though another statute provided for a treble liability in the case of all such corporations generally, but the new Constitution prohibited the legislature from passing any local or special law "granting to any corporation, association or individual any special or exclusive privilege or immunity." If the Act of May 13, 1876, would have had the effect of establishing double liability for the stockholders of banks incorporated under it, whereas the stockholders of banks which should thereafter be incorporated under some other act, or obtain their banking powers by some other legislation, would have treble liability, the result, in our opinion, would have been that the General Banking Act of 1876 would have been unconstitutional in that respect. Historically and logically, the only reason for the added liability provision was because of the exercise by such corporations of the powers of banking. That it was the nature of the functions exercised by the corporation that brought about the imposition of the additional liability of the stockholders is shown by the very phraseology of the Act of May 11, 1874. In order to be constitutional, legislative classification must be based on genuine and substantial distinction in the subjects classified. Therefore, in the case of two sets of corporations exercising a power which is made the basis of additional liability of stockholders, the legislature cannot provide double liability for

the stockholders of the one set of corporations and treble liability for the other merely because of some collateral or adventitious circumstance, as, for example, that they were incorporated or derive their powers under different acts. To be valid, classification must be reasonable, and "must be based on real distinctions in the subject matter which bear some relation to the object sought to be accomplished by the statute:" 12 C. J. 1148, section 878. The additional liability being obviously intended for increased protection of persons dealing with banking institutions, it is inconceivable that different grades of liability could be constitutionally established by the legislature in the case of corporations having and exercising the same powers in that regard merely because they derived those powers from different acts. As a matter of statutory construction, therefore, we must assume that it was not intended that the Act of May 13, 1876, should attempt an unconstitutional result by providing that while banks incorporated under its terms should have double liability for their stockholders, the Act of May 11, 1874, should still continue to impose a treble liability on all other corporations that might thereafter come into existence as banks or receive the powers of banks. On the contrary, since the General Banking Act of May 13, 1876, contained a general repealing clause of all prior acts inconsistent with its provisions, it seems to us clear that thereby the Act of May 11, 1874, was rendered inoperative as to any corporation upon which thereafter banking functions might be conferred. The Act of May 13, 1876, was intended to be, and was, a general and exclusive act for the incorporation of banks thereafter. All previous banking incorporation acts were repealed by it. Presumably, as the situation must then have been viewed, there was no way by which a banking institution could arise other than through the portals of the Act of May 13, 1876.

The question of the repeal of one statute by another is purely one of legislative intention, and all rules of construction have in view the ascertainment of that intention. One such rule or canon of statutory interpretation is that a subsequent statute, evidently intended as a revision of the whole subject matter of, and as a substitute for, prior legislation, even though it contain no express words of repeal, must, on general principles of law, as well as in reason and common sense, operate to repeal the former statute: Johnston's Estate, 33 Pa. 511, 515 (1859); Jefferson County v. Rose Township, 283 Pa. 126, 131 (1925); Garr v. Fuls, 286 Pa. 137, 148 (1926); Reeves's Appeal, 33 Pa. Superior Ct. 196, 201 (1907).

Of course, the constitutional provision against special legislation did not apply to corporations already in existence under special charters when the Constitution was adopted, and, therefore, the Act of May 13, 1876, made no attempt to change the measure of individual liability of the stockholders of such corporations, although it did contain a provision (section 32) that any corporation then in existence could come under its provisions if it so desired. It thus aimed at the generality which was sought by the new Constitution. It gave an opportunity to banks then existing to reorganize under it and thus avail themselves of, or subject themselves to (as the case might be), the double liability provision, and this same double liability provision was to apply to all banks thereafter incorporated.

In short, what the legislature said by the Act of May 13, 1876, in effect, was this: "Banking institutions now have varying degrees of individual liability of stockholders, some of them by virtue of special acts and some by virtue of the Act of May 11, 1874. We will now allow any such companies to come under the provisions of the new statute of May 13, 1876, and thus to attain a uniformity of individual liability, namely, double liability of stockholders. As to

the future, while there is now in force the Act of May 11, 1874, providing for treble liability, we say that in the future banks incorporated under the provisions of the new Act of May 13, 1876, shall not have a treble but a double liability, and as we know of no way, and there is no provision in the law for any way, by which banks hereafter can come into existence except by and under the new statute, and we are now enacting a general and exclusive banking act for the Commonwealth, this means that it is our intent that all banks hereafter incorporated shall have double liability of stockholders, and we expressly repeal all prior legislation inconsistent with this intent, and, therefore, the Act of May 11, 1874, providing for an inconsistent treble liability, shall have no future operation."

There remains but to add that in order to determine whether or not the Act of May 13, 1876, was meant to and did in fact repeal the Act of May 11, 1874, we must, in our construction of the legislative intent, be guided by the law and the circumstances as they then existed. It is clear that at that time banking privileges were obtainable only by corporations organized under and regulated by the Act of May 13, 1876, and there was no apparent reason whatever for any future use of the Act of May 11, 1874.

For the reasons thus stated, we have arrived at the conclusion that the Act of May 11, 1874, was effective at the date of its passage in imposing a treble liability upon banking institutions and in allowing the specially theretofore incorporated companies to come under its provisions, but when the General Banking Act of May 13, 1876, was passed, giving to companies theretofore incorporated the right to come under its provisions, expressly repealing all inconsistent prior legislation, providing what was evidently intended to be an exclusive and general method for the incorporation of banks in the future, providing for double liability of stockholders of such banks, it thereby necessarily repealed the Act of May 11, 1874, as far as any then future operation of that act was concerned, and thereby the only basis of the present claim against the defendant entirely disappears.

It may be contended that, under this view of the case, the Act of May 9, 1923, vested title insurance and trust companies with banking powers and yet without imposing any additional liability upon their stockholders, and thus gave to such stockholders privileges and immunities not enjoyed by stockholders of banks incorporated under the General Banking Act, and, therefore, just as it has been pointed out that the Banking Act of May 13, 1876, could not constitutionally impose a double liability if the Act of May 11, 1874, were, as to similar institutions, to impose a treble liability, so it must be equally unconstitutional for the Act of May 9, 1923, to bring about a result which involves an equally objectionable lack of generality. Indeed, it may be contended that it is exceptionally unjust that title insurance companies should have all the powers of banks and probably more, and yet that their stockholders should have no added liability such as that to which the stockholders of banks are subject. The present case, however, does not call for a decision as to whether the legislature constitutionally could, by the Act of May 9, 1923, grant to title insurance companies powers equal or similar to those of banks without at the same time imposing equal or similar liability upon their stockholders. We have held that, notwithstanding the Act of May 9, 1923, the defendant in this case is not liable because the Act of May 11, 1874, under which liability is claimed, is no longer in effect. If it be that the Act of May 9, 1923, is unconstitutional as specially granting privileges or immunities to stockholders of title insurance companies as compared with those of banks, nevertheless, and indeed a fortiori, the defendant would not be liable, because in that event the

515

grant of banking powers to title insurance companies under that act would have been invalid, and, therefore, the question of additional liability of stock-holders of such companies would remain decided by the case of De Haven *v.* Pratt. Whether it would be wise for the legislature to reënact the statute of May 9, 1923, with an added provision imposing the same double liability upon stockholders of title insurance companies as is imposed upon stockholders of banks by the Act of May 13, 1876, is for that body to determine. As was said by Mr. Justice Elkin in De Haven *v.* Pratt (page 653) :

"As a matter of business policy on the part of trust companies and as a pro-tection to the public dealing with these institutions, there is every reason why this double liability should be imposed on their stockholders, but this is a legislative and not a judicial question."

The affidavit of defense raising questions of law is sustained. It is held that the plaintiff's statement of claim does not set forth a valid cause of action, and accordingly judgment is entered for the defendant.

---

[1] For example: Franklin Bank, April 1, 1870, P. L. 736; State Bank, March 3, 1870, P. L. 335; Manayunk Bank, June 14, 1871, P. L. 1358.

[2] For example: Arsenal Bank, March 20, 1872, P. L. 469; Farmers' and Mechan-ics' Bank of East Birmingham, March 14, 1872, P. L. 364.

[3] For example: Myerstown Bank, March 25, 1873, P. L. 372; Logan Bank, April 17, 1872, P. L. of 1873, 1114.

[4] For example: West Philadelphia Mutual Saving Fund and Trust Company, May 20, 1857, P. L. 632. This liability was reduced by the Act of April 1, 1869, P. L. 593, to treble liability. See, also, Franklin Saving Fund Society, May 20, 1857, P. L. 664.

[5] The individual liability for materials furnished was eliminated by the supple-mental Act of April 17, 1876, P. L. 30.

[6] Since then the Act of May 8, 1907, P. L. 192, provides for such a preference in the case of insolvent trust companies.

[7] It is interesting to note that, presumably in accordance with the decision in Dreisbach *v.* Price, 133 Pa. 560, *supra*, the bill sought to charge the stockholders with double the par value of their stock, in addition to the original payment of its par value, and not merely, as in the present case, to the extent of 100 per cent. of the par value of their respective holdings of stock of the company.

[8] For example: The Acts of July 17, 1919, P. L. 1032; May 16, 1923, P. L. 248; April 26, 1929, P. L. 820. See, also, Act of February 19, 1926, P. L. 30.